RENDERED: AUGUST 6, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-0874-MR

CHARLES F. MAHL                                                         APPELLANT

APPEAL FROM JEFFERSON CIRCUIT COURT
v.      HONORABLE GINA KAY CALVERT, JUDGE
ACTION NO. 05-CI-500770

LOUANNE MAHL                                                            APPELLEE

OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE: CALDWELL, COMBS, AND L. THOMPSON, JUDGES.

CALDWELL, JUDGE: This is an appeal from a Jefferson Family Court judgment

modifying maintenance.[1] For the reasons stated herein and in light of the unique

---

[1] Although the propriety of an attorney fee award was also challenged in the Appellant's brief, we do not reach this issue as it is not properly before us. The trial court's order required that the award be paid directly to the attorney, who could then enforce the judgment in his own name. But this attorney was not named as a party in the notice of appeal, leading to the filing of a motion to dismiss the appeal for failure to name an indispensable party. Although declining to dismiss the entire appeal, another panel of this Court has previously ruled that the attorney fee issue "fails for want of jurisdiction" by order dated June 30, 2020. Thus, we express no opinion on the attorney fee award.

facts of this case, we conclude that the trial court abused its discretion in granting the motion to modify maintenance rather than allowing the maintenance award of $6,000 per month to terminate in 2017 in accordance with terms in the 2007 divorce decree. Thus, we reverse and remand with directions to issue an order denying the motion to modify maintenance.

## FACTS AND PROCEDURAL HISTORY

Appellant Dr. Charles Mahl ("Charlie") and Appellee Louanne Mahl ("Louanne") divorced in 2007 after about twenty-nine years of marriage. Although Charlie had previously worked as an eye surgeon and Louanne as a surgical nurse, neither was working at the time of their divorce and the trial court found both to be disabled. Charlie was then receiving about $28,000 per month in disability benefits, which would terminate when he turned 65 in the fall of 2017.

---

Despite the argument in Louanne's brief that the entire appeal should be dismissed for failure to name her attorney as an indispensable party, we decline to dismiss the appeal of those parts of the judgment other than the award to be paid directly to the attorney. *See Hutchinson v. Hutchinson*, 293 Ky. 270, 168 S.W.2d 738, 739 (1943) (award of a fee directly to an attorney makes the attorney "a party in interest to the litigation" so that "**such part of the judgment** [awarding fee directly to the attorney] cannot be vacated or modified unless he be treated as a party and on appeal to this court be expressly made so." (emphasis added)). Furthermore, this is consistent with more recent unpublished opinions (albeit with no binding authority) in which this Court has reached other issues and has not dismissed the entire appeal, but has declined to review attorney fee issues where the attorney fee award is to be paid directly to the attorney and the attorney can enforce the judgment in his/her own name, but such attorney is not named as a party in the notice of appeal. *See P.L.U. v. A.D.H.*, No. 2019-CA-000293-ME, 2019 WL 4896843, at *4 (Ky. App. Oct. 4, 2019); *Taylor v. Taylor*, No. 2004-CA-002054-MR & No. 2004-CA-002164-MR, 2006 WL 1195910, at *3 (Ky. App. May 5, 2006). We note these unpublished cases as there is no recent published case that adequately addresses this issue.

The trial court divided the marital property approximately equally with each party receiving about four-and-a-half million dollars' worth of assets. The trial court ordered, *inter alia*, that $764,117 from Charlie's IRA[2] trust account be transferred to Louanne to equalize the amounts of the parties' IRAs. Also, the trial court ordered that Louanne receive $59,368 from the parties' joint West End Opportunity Fund account[3] to equalize distributions taken by the parties. The Jefferson Family Court also ultimately ordered Charlie to pay Louanne $6,000 a month in maintenance, terminating upon Louanne's remarriage or cohabitation or either party's death or Charlie's turning 65 years old in 2017, whichever happened first.

---

[2] Individual Retirement Account.

[3] In the August 2007 divorce decree, the trial court found that Charlie had about $1.84 million in an IRA trust account. And it ordered that Louanne receive $764,117 from Charlie's IRA trust account "[t]o equalize the division of the retirement accounts" and that the IRA trust account be divided by a Qualified Domestic Relations Order ("QDRO") to be drafted by Louanne's attorney. (p. 11 of Findings of Fact and Conclusions of Law entered August 1, 2007, attached as Appendix D to Appellee's Brief, also Record ("R."), p. 1041). The parties later agreed that the IRA funds would be transferred into another account without needing to prepare a QDRO, but the transfer apparently was delayed due to settlement negotiations during the appeal and unfortunately all the funds in the IRA were lost in the Ponzi scheme before Louanne ever received the transfer. (*See* pages 18-19 of order dated 3/28/2019, attached as Appendix 2 to Appellant's brief).

In a late September 2007 order, the trial court amended the divorce decree to reflect that the parties had $103,688 in the joint West End Opportunity fund account and that Charlie had withdrawn $50,000 but could only account for $34,931.80 used to pay the marital expense of property taxes. So, the trial court ordered that Louanne "shall receive the first $15,068.20 from the account, and the remaining $88,599.80 in the account shall be divided equally." (p. 1 of 9/28/2007 order, attached as Appendix E to Appellee's brief). $15,068.20 plus half of $88,599.80 equals approximately $59,368.

Charlie filed an appeal and Louanne filed a cross-appeal. Both parties raised, *inter alia*, various issues about the trial court's division of marital property and/or about its valuation of various marital assets. Charlie contended that the trial court erred in awarding maintenance. Louanne argued that the trial court erred in ordering that maintenance cease when Charlie turned 65 in 2017. This Court rendered an unpublished decision affirming the Jefferson Family Court's judgment in July 2009. *Mahl v. Mahl*, No. 2007-CA-002160-MR & No. 2007-CA-002344-MR, 2009 WL 1884375 (Ky. App. Jul. 2, 2009).

Unfortunately, in early 2009 and while the appeal was pending, the parties received notification that their West End Financial accounts had been frozen. Ultimately, the parties lost millions of dollars from these West End financial accounts in a Ponzi scheme.[4] Both parties lost significant amounts of

---

[4] BLACK'S LAW DICTIONARY (11th ed. 2019) defines a *Ponzi scheme* as follows:

> A fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for the original investors, whose example attracts even larger investments. • Money from the new investors is used directly to repay or pay interest to earlier investors, usu. without any operation or revenue-producing activity other than the continual raising of new funds. This scheme takes its name from Charles Ponzi, who in the late 1920s was convicted for fraudulent schemes he conducted in Boston. Cf. PYRAMID SCHEME; GIFTING CLUB.

The funds lost in the Ponzi scheme in this case had been invested with a family friend, William Landberg, at West End Financial. Landberg was criminally prosecuted. By the time the proceedings below concluded in 2019, apparently neither Charlie nor Louanne had yet succeeded in recovering any assets lost in the Ponzi scheme.

money, including the funds in Charlie's IRA account and the $59,368 from the joint West End Financial Opportunity Fund account which had been awarded to Louanne in the divorce decree.

In December 2016, Louanne filed a motion to modify maintenance.[5] As grounds, she alleged changed circumstances including: 1) Charlie having returned to active medical practice despite being disabled at the time of the 2007 divorce decree, 2) her not having received $764,117 equalization payment due to her from Charlie's IRA trust account, and 3) her loss of her own sums in the Ponzi scheme.

After a hearing, the trial court issued an order in June 2018 finding substantial and continuing changes in circumstances which it concluded rendered the original maintenance award unconscionable. Specifically, it found a substantial and continuing change in circumstances because Louanne did not receive the $764,117 from Charlie's IRA trust account nor the $59,368 from the joint West End Financial Opportunity Fund account nor expected interest income

---

[5] Along with her motion to modify maintenance, she also filed a motion for a show cause hearing and motion to compel payment of the funds due to her from Charlie's IRA trust account. And she filed a motion for a refund and payment of funds from the joint West End Financial Opportunity Fund account. She alleged that she had never received the funds due to her from these accounts under the divorce decree, and further alleged that Charlie had improperly withdrawn $25,000 from the West End Financial Opportunity Fund account while the first appeal was pending. From our review of the record, it is not clear that the trial court ever ruled upon these motions before entering its order modifying maintenance.

from these funds.[6]  Additionally, it found another substantial and continuing change in circumstance in Charlie's return to medical practice.

The trial court further determined that these substantial and continuing changes in circumstances resulted in making the original maintenance award—implicitly including the term that maintenance would terminate at the latest upon Charlie's reaching the age of 65 in 2017 (ten years after the decree)—unconscionable.  It found that Louanne, unlike Charlie, lacked financial stability in large part due to her not receiving sums due to her under the decree as well as inability to work and earn money.  In doing so, it issued somewhat conflicting findings acknowledging that the Ponzi scheme losses were not either party's fault but also seemingly casting some blame on Charlie for transferring funds from another institution to West End.

The trial court also rejected Charlie's argument that Louanne's motion for modification was barred by laches, and it concluded that the divorce decree "created an enforceable judgment" against Charlie to pay the sums of $764,117 and $59,368 to Louanne.  After another hearing, the trial then issued a final and appealable order in March 2019 requiring that Charlie pay $8,688.00 per month maintenance until Louanne's "remarriage, cohabitation or death, or until she

---

[6] The trial court noted that the divorce decree had estimated that Louanne would be able to earn interest of 9.81% on the funds in these accounts.

collects on the 2007 enforceable judgment created in the Decree for the

$764,117.00 and $59,368.00 payments, whichever comes first."

**Trial Court Abused Its Discretion in Allowing Modification of Maintenance to Extend Past Original Termination Date**

We review the trial court's ruling on the motion to modify

maintenance for abuse of discretion. *Tudor v. Tudor*, 399 S.W.3d 791, 793 (Ky.

App. 2013). Kentucky Revised Statutes (KRS) 403.250(1) provides that

maintenance may be modified "only upon a showing of changed circumstances so

substantial and continuing as to make the terms unconscionable."

"Unconscionable" means "manifestly unfair or inequitable." *Shraberg v.*

*Shraberg*, 939 S.W.2d 330, 333 (Ky. 1997); *Wilhoit v. Wilhoit*, 506 S.W.2d 511,

513 (Ky. 1974). The policy of the statute is for relative stability; therefore,

evidence for the movant must be compelling for the trial court to grant the relief

requested. *Bickel v. Bickel,* 95 S.W.3d 925, 927-28 (Ky. App. 2002). A trial court

abuses its discretion when its decision is "arbitrary, unreasonable, unfair, or

unsupported by sound legal principles." *Artrip v. Noe*, 311 S.W.3d 229, 232 (Ky.

2010).

Although we do not necessarily disagree with the trial court's finding

that substantial and continuing changes in circumstances had occurred since the

divorce decree, we conclude that the trial court abused its discretion in determining

that these changes rendered the terms of the original maintenance award

unconscionable. The terms of the original maintenance award provided that, barring certain circumstances not applicable here,[7] Louanne would receive $6,000 per month ($72,000 per year) during the ten-year period between the 2007 divorce decree and Charlie turning 65 in 2017, when maintenance would terminate. Louanne does not deny receiving about $720,000 in maintenance payments over this ten-year period. Louanne further admitted, under cross-examination, that she had received more than one million dollars' worth of marital assets under the divorce decree which were not lost in the Ponzi scheme.

We do not minimize the losses suffered by Louanne, including the loss of other funds which she chose to invest with West End and lost in the Ponzi scheme, in addition to her not receiving the equalization amounts due to her under the decree which were also lost in the same Ponzi scheme. Nor can we ignore that Charlie also suffered many of these same losses. Unfortunately, like many others, Louanne has lost some assets, been unable to earn substantial interest income, and failed to make a profit on some real estate investments in the wake of the 2008 financial crisis.

---

[7] Alternate circumstances for termination, which are not applicable here, were death of either party or Louanne's remarriage. Another circumstance for termination would be Louanne's cohabitation with an intimate partner. Charlie argued to the trial court that Louanne was cohabiting with a partner, but the trial court accepted Louanne's testimony that she was only dating the man in question and spending the occasional night at his house. The trial court's finding that Louanne was not cohabiting with the man was supported by substantial evidence.

But, unlike many others, Louanne received about $720,000 in maintenance payments over a ten-year period. And, by her own admission, she received over one million dollars' worth of assets which were not lost in the Ponzi scheme. Presumably, she could have achieved some degree of financial stability with proper management of the assets and maintenance payments she received—albeit perhaps not being able to enjoy forever the opulent lifestyle the parties had become accustomed to prior to their divorce.[8]

Given the assets and approximately $720,000 in maintenance payments which Louanne did receive, her lack of financial stability by the time of the modification proceedings appears to stem mostly from a combination of bad luck and less than optimal decision-making on her part—as the trial court implicitly acknowledged. For example, the trial court noted how Louanne allowed

---

[8] The parties' standard of living during the marriage must certainly be considered when resolving maintenance issues—particularly determining the amount of the original maintenance award. *See generally Casper v. Casper*, 510 S.W.2d 253, 255 (Ky. 1974); KRS 403.200(2)(c). But it is often practically impossible for both parties to maintain or improve upon the lifestyle they enjoyed during a marriage when one household is split into two households upon divorce. *Powell v. Powell*, 107 S.W.3d 222, 226-27 (Ky. 2003) (Keller, J., concurring in part and dissenting in part). Further, some lifestyle adjustments must often be made upon reaching retirement age and/or actually retiring—one cannot always enjoy the same lifestyle while both ex-spouses refrain from working to earn income. *See Bickel v. Bickel*, 95 S.W.3d 925, 929 (Ky. App. 2002) (recognizing that just as married couples often experience reduced income when retiring, recipients of maintenance upon divorce cannot necessarily expect the same level of support when the obligor ex-spouse retires); *Barbarine v. Barbarine*, 925 S.W.2d 831, 832-33 (Ky. App. 1996) (discussing how obligor spouse's decision to take early retirement did not necessarily entitle him to termination or reduction of his maintenance obligation, given his awareness of his existing maintenance obligation and of the recipient's age and inability to support herself).

a condominium which she owned (Smithfield Greene) to sit unoccupied for four years, without trying to rent it out or otherwise derive income from it. It acknowledged Charlie's assertion that Louanne sold a house she owned (Sallee property) for less than fair market value to her boyfriend and Louanne's claim that she could not have sold it for a higher amount. Louanne ended up netting about $46,700 in proceeds from the sale of the Sallee house according to the trial court's findings. The trial court also took note that Louanne was paying about $750 per month in veterinary expenses for a horse, which she could not ride but said was her pet, and that Louanne was receiving food stamps.

In the original divorce decree, the trial court found that Charlie's $28,000 monthly disability payments (then his primary source of income) would terminate when he turned 65 and the trial court determined that maintenance would terminate when Charlie turned 65 unless other events (such as a party's death) occurred earlier. We affirmed the termination of maintenance when Charlie reached 65 in the prior appeal despite Louanne's challenge to this provision, expressly concluding that terminating maintenance upon Charlie's turning 65 was reasonable "as his disability payments will, likewise, terminate" at that same point in time. *Mahl*, 2009 WL 1884375, at *8.

Regardless of whether Charlie is able or willing to work to earn money now or in the future, these disability payments—which were the source of

his income for paying the original maintenance award—have stopped. It is manifestly unfair under these facts to essentially require him to keep working well past traditional retirement age in order to pay maintenance to Louanne. This is especially true since an essential foundation of the original maintenance award was that it would cease when Charlie reached the age of 65, and no longer would receive the $28,000 monthly disability payments to use for paying maintenance and other expenses.

We also note that Louanne will be able to receive an alternate source of income, though in much more modest amounts than the maintenance payments she previously received, as she has become eligible to receive Social Security benefits. Louanne turned 65 in 2018. And from our review of the record, she could receive roughly $1,100 to $1,700 in monthly Social Security benefits depending on the age at which she elects to start receiving such benefits. Further, Louanne owned her residence[9] with no mortgage, but with monthly homeowners' association fees of $350. Thus, although we do not suggest that Louanne will easily enjoy a luxurious lifestyle at traditional retirement age, she has income and

---

[9] The trial court noted in its March 28, 2019 order that Louanne failed to present a professional appraisal of her current residence (the Smithfield Greene condominium) in the present proceedings. But it also had noted earlier in the order that the 2007 divorce decree referenced the Smithfield Greene condominium being then valued at about $379,000. The trial court also noted that Louanne claimed the condominium was only worth $379,000 presently despite a nearby condominium selling for $420,000 and that Louanne complained that her condominium needed extensive repairs which she could not afford. This appears to be the same condominium which the trial court noted Louanne allowed to sit unoccupied for a four-year period.

assets which—if properly managed—should allow her financial stability despite the termination of maintenance.

Under the facts noted here, the trial court abused its discretion in awarding further maintenance, thus forcing Charlie to bear the brunt of the bad luck and questionable choices made by Louanne after the parties' divorce. Those choices are responsible for Louanne's lack of financial stability now, despite the ample assets and maintenance payments which she had already received. Our Supreme Court in *Woodson v. Woodson*, 338 S.W.3d 261 (Ky. 2011), *overturning Dame v. Dame*, 628 S.W.2d 625 (Ky. 1982), restored to the trial court discretion to decide when modification outweighs the virtue in finality, and expressly stated that in so doing it was not belittling the compelling need for finality in all divorce cases. One of the goals of the dissolution process is, "to sever all ties as much as possible as soon as possible." *Mays v. Mays*, 541 S.W.3d 516, 527 (Ky. App. 2018). Further, where a former spouse who is obligated to pay maintenance cannot rely on there being a reduction in that obligation for imprudent decisions that have reduced their financial resources, neither then should they have to be concerned with imprudent decisions of their former spouse increasing those obligations. *See Barbarine*, 925 S.W.2d 831.

Furthermore, if Louanne has not received funds under the terms of any enforceable judgment,[10] to the extent there may be one from the divorce decree, nothing in this opinion shall prevent Louanne from seeking recovery of such funds via appropriate motion in the Jefferson Family Court on remand or through filing a separate action to enforce any such judgment subject to applicable time limitations as provided by law.[11] But under the facts here, we stand firm that modification to allow for further maintenance past the original termination date after ten years of $6,000 monthly payments was unwarranted and an abuse of discretion.[12] Further issues and arguments raised by the parties which we have not

---

[10] There may be issues about whether the original divorce decree's provisions requiring that Louanne should receive certain funds actually required that Charlie (rather than some other person or entity) pay such funds. There may also be issues about whether any judgment against Charlie is enforceable if such assets were not actually in existence at the time of the judgment. (For example, Charlie argued to the trial court that some funds awarded in the divorce decree may not have actually been in existence at the time of the divorce decree despite paper statements to the contrary due to misleading accounting practices which were an inherent part of the Ponzi scheme.) We express no opinion on the merits of these types of issues here, which are better suited for resolution by a trial court upon proper motion or action to enforce a judgment.

[11] As discussed previously herein, it appears that Louanne previously filed motions in the trial court to compel payment of certain sums which have not yet been resolved. And as the trial court noted, KRS 413.090(1) provides for a fifteen-year limitations period for actions to enforce a judgment.

[12] We do not reach whether the trial court erred in finding the modification motion not barred by laches. Generally, some Kentucky precedent suggests that questions about maintenance are not particularly susceptible to application of the doctrine of laches. *See Woodson*, 338 S.W.3d at 263 (despite the showings which are statutorily required to modify maintenance and "the compelling need for finality in all divorce cases[,] . . . the statute [KRS 403.250] does not divest trial judges of the discretion to decide when modification outweighs the virtue of finality in seeking fairness and equity in what many times may be dire consequences and complicated options."). *See also Heisley v. Heisley*, 676 S.W.2d 477, 477-78 (Ky. App. 1984) (laches not

discussed herein have been determined to lack merit or relevancy to our resolution of this appeal.

## **CONCLUSION**

For the reasons stated herein, we reverse and remand with directions to issue an order denying the motion to modify maintenance.

ALL CONCUR.

| | |
|---|---|
| BRIEF FOR APPELLANT: | BRIEF FOR APPELLEE: |
| Allison S. Russell | Jonathan E. Breitenstein |
| Louisville, Kentucky | Louisville, Kentucky |

---

available as a defense on suit to collect maintenance and child support. arrearages in case in which obligor also argued that maintenance should have been modified).

But we need not determine whether the trial court erred in finding the modification motion not to be barred by laches under the unique facts here, as we conclude that the trial court abused its discretion in modifying the maintenance award to permit additional maintenance payments past the original 2017 termination date on other grounds—even assuming *arguendo* that the motion was not barred by laches despite the modification motion being filed in late 2016 and indications of trouble with West End accounts dating back to at least early 2009.

-14-